IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TERRAH CHERRY, DIVETTA WELLS, AND )
JAUYONTA MORRIS, )
)
    Plaintiffs )
) No. 08 C 3163
v. )
) The Honorable William J. Hibbler
)
CITY OF CHICAGO AND JESSE SMART, )
)
    Defendants. )
)

## MEMORANDUM OPINION AND ORDER

Several City of Chicago Streets and Sanitation Department employees alleged that Jesse Smart sexually harassed them. The City's Department of Human Resources Sexual Harassment Office sustained the employees' complaints against Smart and recommended that he be discharged. The employees, Terrah Cherry, Divetta Wells, and Jauyonta Morris, have now sued the City of Chicago and Jesse Smart. The City moves for summary judgment.

### I. Factual Background

The Plaintiffs, Cherry, Wells, and Morris, all worked in the City of Chicago's Streets and Sanitation Department as hand laborers. Cherry and Wells began working for the Department in June 2006 and Morris began in March 2000. (Def. 56.1(a) St. ("Def. St.") ¶ 2). Smart worked for the Department as an Assistant Division Superintendent from March 2000 until March 2007. (Def. St. ¶ 3). As an Assistant Division Superintendent, Smart patrolled the Loop to ensure that employees within the "Loop Operations" division of the "Street Operations" Bureau of the Department adequately performed their jobs. (Smart Dep. at 9-10; Def. St. ¶ 8). Accordingly, Smart had the authority to issue

1

written reprimands and recommend that division employees be suspended or terminated. (Smart Dep. at 11-12; Def. St. ¶ 9). Smart's recommendations would be reviewed by either the Assistant General Superintendent or the General Superintendent for the Loop Operations Division and then again by the Bureau of Street Operations' head. (Def. St. ¶ 9).

In the summer of 2006, shortly after Cherry and Wells were hired, Smart engaged in a series of inappropriate behaviors directed towards the three Plaintiffs. At some unidentified time in 2006, Smart grabbed Morris by the hand, turned her around, and told her "umm, umm, umm. How I let this pass me by on the weekend?" (Def. St. ¶ 22). Another time, he called Morris to his truck and told her that he "wanted to see [her] before [he] went home for the weekend." (Def. St. ¶ 23). Throughout the June and July 2006, Smart leered at Morris four or five times and occasionally said "umm, umm, umm" to her. (Def. St. ¶ 24). Later, in July 2006, Smart grabbed Morris around the waist and pulled her towards him, again directing suggestive comments to her. (Pl. 56.1(b)(3)(B) St. Ex. 2; Def. St. ¶ 25). When Smart pulled Morris close to her, Morris's broom and shovel were between them and she quickly pushed him away with the shovel. (Def St. ¶ 25). Morris testified that this incident, which occurred sometime in July 2006, was the last time that Smart sexually harassed her. (Morris Dep. at 159-60).

Morris did not complain to the City's Sexual Harassment Office because she had previously complained about Smart and did not want to upset her supervisors. (Morris Dep. at 104). Instead, Morris called Alphonso Nicholson, who was a foreman within the Department. (Def. St. ¶¶ 25-26). Morris asked Nicholson to talk with Dominic Salerno, the General Superintendent of Loop Operations, about the incident. (Def. St. ¶ 26).

Wells began working for the City in June 2006. (Def. St. ¶ 29). Like Morris, Wells worked in Loop Operations and was given a daily assignment from Nicholson or another foreman within the

division. (Def. St. ¶ 31). Wells had only three one-on-one interactions with Smart and she believed that he sexually harassed her twice. (Wells Dep. at 113). First, in August 2006, Wells told Smart that she had a sore throat and did not feel well. (Wells Dep. at 98). Smart offered to "stick his tongue down [her] throat and make it feel better." (Wells Dep. at 98). After discussing the incident with Morris and Cherry, Wells then asked Nicholson if there were anything formal that could be done. (Wells Dep. at 120). Nicholson told Wells he would discuss the incident with Salerno and directed her to contact the Sexual Harassment Office. (Wells Dep. at 120).

About a week later, Smart approached Wells on the street and said "I know your husband must be jealous [because] your supervisor is jealous." (Wells Dep. at 106). When Wells asked him what he meant, Smart then told her that she was "thick, and that's how I like them." (Wells Dep. at 106). Again, Wells spoke with Morris, Cherry and Nicholson after Smart's comments. (Wells Dep. at 126-129). Despite the suggestive comments, Smart never touched Wells or attempted to touch her. (Def. St. ¶ 41).

Cherry also began working for the City in June 2006. (Def. St. ¶ 44). Like Wells and Morris, Cherry received daily assignments from Nicholson and a second foreman within the Loop Operations Division. (Def. St. ¶ 45). Throughout June and July of 2006, Smart made sexually suggestive comments about Cherry's size and lips and asked for kisses. (Def. St. ¶ 47). Smart, however, never actually kissed her. (Def. St. ¶ 47). Cherry also believed that Smart leered at her throughout the summer. (Def. St. ¶ 50). Cherry testified that Smart's sexually suggestive comments occurred during the first month-and-a-half of her employment with the City. (Cherry Dep. at 79, 82)

In July 2006, Cherry and another City employee were eating lunch in a McDonald's restaurant. (Def. St. ¶ 52, Cherry Dep. at 244-46). Cherry attempted to slip by Smart, but he intercepted her at the staircase. (Def. St. ¶ 52). Smart then grabbed Cherry's hand and pulled it towards his crotch.

(Def. St. ¶ 53). To avoid Smart's advance, Cherry called to her coworker to draw attention to herself, to Smart, and the public nature of their surroundings. (Def. St. ¶ 53). According to Cherry, as he pulled her hand towards his crotch, he made a sexually suggestive comment. (Def. St. ¶ 54).

Cherry discussed the McDonald's incident with Wells and learned that Smart was also harassing Wells. (Def. St. ¶ 56). When Wells complained to Nicholson about Smart's advances, she also reported Smart's behavior regarding Cherry. (Cherry Dep. at 62-63). Nicholson informed Cherry that he had to let the Sexual Harassment Office know about Smart's behavior. (Cherry Dep. at 62-63).

As the Plaintiffs' complaints regarding Smart trickled into Nicholson, he reported Smart's behavior to Salerno. (Def. St. ¶ 59). Salerno told Smart to act professionally, but did not formally reprimand him. (Salerno Dep. at 42). In September 2006, the Plaintiffs' complaints reached the Sexual Harassment Office, which began to investigate Wells's complaints. (Def. St. ¶ 43). As the investigation began, the City immediately transferred Smart to another Department. (Def. St. ¶ 61). Both Cherry and Morris testified before the Office during its investigation of Wells's complaints. (Def. St. ¶¶ 27, 57). All three Plaintiffs eventually signed formal complaints against Smart. (Def. St. ¶¶ 27, 43, 57). At the conclusion of the investigation in February 2007, the Sexual Harassment Office recommended Smart be terminated. (Def. St. ¶ 61). In March 28, 2007, shortly after a pre-disciplinary meeting, Smart resigned. (Def. St. ¶ 62).

On June 9, 2007, Cherry filed a charge of discrimination with the EEOC. On June 12, 2007, Morris and Wells filed their charges. (Def. St. ¶¶ 71-73). After the EEOC issued right-to-sue notices, the Plaintiffs filed this suit.

## II. Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue

4

as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct., 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and judgment as a matter of law should be granted in its favor. Fed. R. Civ. P. 56(c). Once the moving party has met the initial burden, the nonmoving party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial."*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must offer more than a mere scintilla of evidence to survive summary judgment, and conclusory allegations are insufficient to defeat a motion for summary judgment. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir.2006); *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir.2005). During the Court's review, it must view all evidence and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

### III. Analysis

In Illinois, an individual must file a claim before the Equal Employment Opportunity Commission within 300 days of the alleged discriminatory act. *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1121 n.4 (7th Cir. 2009). Failure to do so renders those claims untimely. *Id.* Where an employee alleges a continuous and ongoing hostile work environment, the employee need only file an EEOC charge within 300 days of the last hostile act. *Moore v. Vital Prod., Inc.*, — F.3d —, 2011 WL 2022951, at *3 (7th Cir. May 25, 2011). The City argues that Cherry and Morris did not timely file a claim with the EEOC and therefore their claims are time barred. The Plaintiffs fail to respond to this argument. Nonetheless, because the moving party bears an initial burden of demonstrating that the uncontroverted facts entitle it to judgment as a matter of law, the Court must still evaluate the City's argument. *Nabozny v. Podlesny*, 92 F.3d 446, 457 n.9 (7th Cir. 1996); *cf. Palmer v. Marion County*,

327 F.3d 588, 597-99 (7th Cir. 2003) (noting that *claims* not developed during summary judgment are abandoned); *Laborers Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (noting that arguments not raised before the district court cannot be raised on appeal).

Neither Cherry nor Morris points to any incident of harassment that occurred less than 300 days before they filed their claims with the EEOC. Both Cherry and Morris admitted during their depositions that Smart's harassment took place in June and July 2006.[1] Even giving Cherry and Morris the benefit of the doubt and assuming that Smart harassed them through July 31, 2006, Cherry and Morris had until May 28, 2007 to file a claim with the EEOC. Cherry filed her claim with the EEOC on June 9, 2007, and Morris filed hers on June 12, 2007. Thus, Cherry's and Morris's claims are time-barred. The Court therefore GRANTS the City's Motion for Summary Judgment with regard to Cherry and Morris.

Only Wells points to incidents of harassment that occurred in August 2006. These incidents, however, do not amount to actionable sexual harassment. A plaintiff can establish a violation of Title VII by proving discrimination based on sex has created a hostile or abusive work environment. *Moser v. Ind. Dep't. of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005). In order to do so, a plaintiff must demonstrate that: (1) she was subjected to unwelcome harassment because of her sex; (2) the harassment was severe or pervasive enough to create a hostile work environment; and (3) there is a basis for employer liability. *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 993-94 (7th Cir. 2011). It is well settled that Title VII is not a general code of civility and simple teasing, offhand comments, and isolated incidents do not amount to actionable harassment. *Moser*, 406 F.3d 895, 903

---

[1] Although Cherry and Morris did not respond to the City's argument, the Court nonetheless examined both their statements of fact and the City's statements of fact and did not locate any alleged instances of sexual harassment that occurred in August 2006.

6

(7th Cir. 2005). "Vulgar banter, tinged with sexual innuendo," does not generally amount to actionable sexual harassment. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). Rather, the harassment must be sufficiently severe or pervasive to make a reasonable person feel that the work environment has been altered. *Turner v. The Saloon, Ltd.*, 599 F.3d 679, 685 (7th Cir. 2010).

In *Baskerville*, the manager called the plaintiff a "pretty girl," made a sexually suggestive grunting sound when she walked by in a leather skirt, suggested that his office had become "hot" because the plaintiff had walked into it, suggested that "all pretty girls run around naked" over the public-address system, told the plaintiff that his wife told him to clean up his act and to think of the plaintiff as "Ms. Anita Hill," told the plaintiff that he left a Christmas party because there were so many pretty girls and he "didn't want to lose control," simulated masturbation and implied that he was lonely in his hotel room. *Baskerville*, 50 F.3d at 430. These comments, however, were not sufficient to support a hostile work environment claim. *Id.* at 430-31.

The comments made by the manager in *Baskerville* and the comments made by Smart are strikingly similar in nature. In this case, Wells testified that Smart twice directed sexually suggestive comments towards her. First, he offered to "stick his tongue down [her] throat" to make it feel better after she complained of having a sore throat. Second, he implied that he was jealous of Wells's husband because of she was "thick," which was how he "like[d] them." In short both Smart and the manager in *Baskerville* implied that they found the plaintiffs sexually desirable and directed lewd and offensive comments, laced (not tinged) with sexual innuendo towards the respective plaintiffs. The manager in *Baskerville*, however, made significantly more sexually suggestive comments than Smart and did so over a greater period of time, and even those comments were not sufficient to support a hostile environment claim. Moreover, in this case, Smart never touched, or even attempted to touch Wells, *see Turner*, 599 F.3d at 686 (noting that inappropriate touching dramatically increases the

7

severity of sexual innuendo), and his two comments directed towards her, albeit offensive, do not rise to the level necessary to support a hostile work environment claim.

Wells offers no substantial argument that Smart's comments are actionable. She cites not a single case in support of her argument that Smart's comments were sufficiently severe or pervasive that they would make a reasonable employee feel that the work environment had been materially altered.[2] The Court therefore GRANTS the City's Motion for Summary Judgment with respect to Wells.

IT IS SO ORDERED.

_6/24/11_
Dated

Hon. William J. Hibbler
U.S. District Court

---

[2]Instead, Wells and the other Plaintiffs spend much of their brief arguing that the City's response to Smart's harassment was insufficient. Whether the City appropriately dealt with Smart is a question the Court need only reach if it finds that Smart's conduct violated Title VII and that Smart was not a supervisor. Because the Court has found that Wells did not suffer a hostile work environment it need not answer this question. Plaintiffs' argument, however, bears mentioning. In short, the Plaintiffs complain that after the Smart resigned, the City rehired him, despite the fact that it purportedly put him on a do-not-rehire list. Employer's responses to employee harassment must only be reasonably calculated to prevent further harassment. *Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 953-54 (7th Cir. 2005). In other words, the Plaintiffs would not be entitled to vengeance or the remedy of their choice — apparently, Smart's termination would have been the only remedy to have satisfied them. They instead are entitled to a remedy that prevents further harassment. Immediately after the Plaintiffs complained about Smart's behavior the City transferred him to another position, investigated his conduct, and ultimately gave him the option to resign prior to termination. That response not only was reasonably calculated to prevent further harassment, it did prevent further harassment.

8